### THE PEOPLE *ex rel.* McMAHON *vs.* THE SHERIFF OF WESTCHESTER COUNTY.

The intent to do bodily harm to some one out of a number of persons is necessary, under the 2d subd. of sec. 5 of 2 Rev. Stat. p. 657, to constitute the crime of murder, even where the homicide is effected by an act imminently dangerous to others, evincing a depraved mind, regardless of human life.

*Dubitatur,* whether there should not also be an intent to kill, though not aimed at any particular person.

Deaths caused by the burning of a steam boat which results from the making of excessive fires for the purpose of creating excessive steam, in order to out-race another steam boat, declared not to come under the denomination of murder, but parties held to bail for manslaughter in the first degree.

The People *v.* The Sheriff of Westchester County.

Where the offence was committed on navigable tide waters wholly within the state of New York, and the United States Courts and the State Courts assumed jurisdiction thereof, the former prior in point of time to the latter, it was held on a writ of habeas corpus issued to test the legality of the latter arrest, that the conflict of jurisdiction could only be avoided by setting up judgment pronounced in one of the tribunals, which, when obtained, would be a bar to the proceeding in the other.

It was also held to be by no means clear that the State Courts had not jurisdiction over the subject matter of the offence whereof jurisdiction had already been exercised by the United States tribunal. At all events, the question considered too important to be decided summarily on habeas corpus.

The relator presented on the 24th day of August, 1852, to Mr. Justice Edmonds, his petition, verified in due form, setting up that John F. Tallman, captain of the steam boat Henry Clay, Edward Hubbard, pilot of said vessel, James L. Jessup, captain's clerk, John Germaine, engineer, Charles W. Merritt, second engineer, or oiler, James Elmendorf, second pilot, were, together with Thomas Collyer, one of the owners of said vessel, detained in the custody of the sheriff of Westchester county, under an arrest made by him in pursuance of a warrant issued by John W. Mills, county judge of Westchester county, on a complaint made before him by Edward Wells, district attorney of Westchester county, charging the said parties with murder.

That such arrest was made in the city of New York, wherein the said sheriff then held them.

The petitioner further alleged that prior to such arrest, to wit, on or about the fourth, seventh and eleventh days of August, 1852, the said several parties had been arrested, committed and bailed in the United States Circuit Court for the southern district of New York, the said court having jurisdiction of the offence on warrants issued out of said court on complaints made before George W. Morton, a commissioner of said court, having authority to entertain the same for the selfsame offence with that complained of before the Westchester authorities. That the complaint in Westchester county, and that before the United States court in this district, were based on the same alleged guilty and felonious act.

And the arrest, commitment and holding to bail in the United

The People *v.* The Sheriff of Westchester County.

States courts were anterior in point of time to the arrest under the Westchester warrant, and the United States authorities were entertaining and holding jurisdiction of said offence.

The petitioner, therefore, prayed that a writ of habeas corpus might issue to the said sheriff, commanding him to bring up the said parties before Justice Edmonds, to do and receive what should then and there be considered concerning them.

Annexed and referred to in this petition, were the following documents, duly certified, viz:

The warrant of arrest on the charge of murder issued out of Westchester county by Judge Mills.

The complaints made before the United States court in this district. The several warrants issued on said complaints by United States Commissioner Morton. And the bail bonds given by the several parties on their respective commitments under said warrants by the United States' court.

On this petition a writ of habeas corpus in due form directed to the sheriff of Westchester county, and commanding him to bring up the said several parties before Justice Edmonds, at the City Hall of the city of New York, on the 26th day of August, 1852, was duly allowed and served in the city of New York, on the sheriff of Westchester county.

And in pursuance of the said writ, the sheriff of Westchester county returned that he held the said several parties in custody under and in pursuance of the warrant issued by Judge Mills referred to, and a copy of which was annexed to Mr. McMahon's petition, upon which return it was agreed by the respective counsel for the prisoners and the district attorney of Westchester county, that the facts set forth in Mr. McMahon's petition should be admitted to be true for the purposes of the argument on the writ of habeas corpus.

The Westchester warrant and the complaints before the United States courts were referred to in detail on the argument of the habeas corpus, and they were in substance as follows:

The Westchester warrant recited that Edward Wells, district attorney of Westchester county, had made a complaint before John W Mills, judge of the county of Westchester, that on the

28th July, 1852, the steam boat Henry Clay, used and navigated on the *Hudson river within the boundaries of the state of New York,* for the conveyance of passengers, &c., while on her passage from Albany to New York with passengers on board, took fire opposite the county of Westchester, and was run on short in the town of Yonkers, in said county, and was consumed there by fire. That at that time divers persons, whose names are given at length, or stated to be unknown, were passengers on said boat, and that said persons, excepting one John K. Symonds, by reason either of the shock of the collision of the said boat with the shore, were cast and thrown, or in their efforts to save themselves from destruction by fire, did cast and throw themselves into the Hudson river and were suffocated and drowned, and in consequence thereof died, and that John K. Symonds was burnt to death on board of the said boat.

That John F. Tallman was captain and one of the owners of the boat, and had part of the charge thereof. That Thomas Collyer was one of the owners and had part of the charge of the boat.

That James L. Jessup was second captain, or clerk, and had part of the charge thereof; likewise Edward Hubbard, who was pilot, also James Elmendorf, the second pilot. That John Germaine was engineer, and Charles W. Merritt second engineer, and had part of the charge thereof, and that a young man whose name was unknown was barkeeper and had part of the charge thereof.

That while the said boat was navigating the Hudson river on that day, for the purpose of excelling in speed a certain other steam boat called the Armenia, used also for the conveyance of passengers on said river, or for the purpose of increasing the speed of the Henry Clay, the said prisoners did create, or allow to be created, an undue or an unsafe quantity of steam, and in so doing did make or cause or allow to be made upon the Henry Clay, excessive fires, and did not use ordinary prudence in the management of the same, and although remonstrated with on account of the same by different passengers on board, did not for a long time abate the same, but for a long

The People *v.* The Sheriff of Westchester County.

while continued the same, in consequence whereof and of the culpable negligence and criminal recklessness of the said Tall-man, Collyer, Jessup, Elmendorf, Hubbard, Germaine, Merritt, and of the barkeeper of the Henry Clay, the said boat did then and there take fire, and all of the deaths ensued as aforesaid. That the complainant has reason to suspect and believe that all and each of the abovenamed deceased passengers were murdered by an act perpetrated by the said Tallman, Collyer, Jessup, Elmen-dorf, Hubbard, Germaine, Merritt and the barkeeper, which act was immediately dangerous to others, and evinced a depraved mind, regardless of human life, although it was perpetrated without any premeditated design to effect the death of any par-ticular individual, and that he believes the said several prison-ers did feloniously kill and murder the said deceased persons in the manner and by the means above stated. The warrant fur-ther recited that said complaint prayed that the said several prisoners might be apprehended and held to answer the said charge, and it commanded the sheriff of Westchester county to arrest the said prisoners and bring them before John W. Mills, county judge, to be dealt with, &c. The warrant was signed by the county judge, and dated the 13th August, 1852, and was in due form.

The United States complaints were as follows:

*Southern District of New York, ss.*—Michael Cavanagh, being duly sworn, deposes and says that he resides at present in this city, and was a passenger on board the steam boat Henry Clay (a vessel propelled in whole by steam) from Newburg on the twenty-eighth day of July, one thousand eight hundred and fifty-two.

And this deponent further says, that Thomas Collyer, an owner, John F. Tallman, captain, John Germaine, engineer, James L. Jessup, clerk, and Edward Hubbard, pilot of said steam boat called the Henry Clay, being persons employed on board said steam boat, which said steam boat was propelled by steam, did at about half past three o'clock in the afternoon of Wednesday the said twenty-eighth day of July, on the Hudson

river, near Yonkers, within the southern district of New York, in the second circuit, and within the jurisdiction of the United States of America, by their misconduct, negligence or inattention to their respective duties on board said steam boat, cause the death of Julia Hoy, this deponent's niece, then and there being a passenger on board said steam boat Henry Clay, and did also cause the death of A. J. Downing, Mrs. Maria Bailey, Miss Maria Bailey, Mary Ann Robinson, Elizabeth Hillman, Matilda Wadsworth, J. J. Speed, and others, who were likewise passengers on board said steam boat.

*Southern District of New York, ss.*—William A. Irvin being duly sworn, deposes and says, that he does business in the city of Pittsburgh, and was a passenger on board the steam boat Henry Clay from Albany, on the twenty-eighth instant.

And this deponent further says, that by the misconduct, negligence or inattention to their respective duties, of J. F. Tallman, captain, John Germaine, engineer, James L. Jessup, clerk, Thomas Collyer, one of the owners, and Edward Hubbard, pilot of the said steam boat called the Henry Clay, which said vessel was propelled in the whole by steam, on the said twenty-eighth day of July, one thousand eight hundred and fifty-two, on the Hudson river, near Yonkers, in the southern district of New York, the lives of Stephen Allen, and others on board said steam boat, were destroyed by burning or drowning, said J. F. Tallman, John Germaine, James L. Jessup, Thomas Collyer, and Edward Hubbard, being employed on board of said steam boat called the Henry Clay.

*Southern District of New York, ss.*—Michael Cavanagh, being duly sworn, deposes and says, that he was a passenger on board the steam boat Henry Clay (a vessel propelled in whole by steam) from Albany, on the twenty-eighth day of July, in the year one thousand eight hundred and fifty-two, and that on that day, to wit, on the Hudson River, near Yonkers, in the southern district of New York, in the second circuit, and within the jurisdiction of the United States of America, at

The People *v.* The Sheriff of Westchester County.

about half past three o'clock in the afternoon, by the misconduct, negligence or inattention of James Elmendorf, second pilot, and Charles Merritt, assistant engineer of said steam boat Henry Clay (then and there being persons employed on board said steam boat,) to their respective duties on board said steam boat, did cause the death of Julia Hoy, A. J. Downing, Mrs. Maria Bailey, Miss Maria Bailey, Matilda Wadsworth, J. J. Speed, and others on board said steam boat by burning or drowning.

The Westchester complaint was based upon the second subdivision of *2d Rev. Stat. p.* 746, *sec.* 5, *3d ed.,* which provides in substance: That the killing of a human being without the authority of law, by any means whatever, shall be murder when perpetrated by any act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect death of any particular individual.

The United States complaint was based on the 12th section of the act of congress of July 7th, 1838, which provides:

That every captain, engineer, pilot or other person employed on board of any steam boat or vessel propelled in whole or in part by steam, by whose *misconduct, negligence* or inattention to his or their respective duties, the life or lives of any person or persons on board said vessel may be destroyed, shall be deemed guilty of manslaughter, and upon conviction thereof before any circuit court of the United States, shall be sentenced to confinement at hard labor for a period not more than ten years.

The matter came on to be argued before Mr. Justice Edmonds, on the first day of September, 1852, on the return and facts agreed upon by the respective counsel.

*Dennis McMahon, Jr.,* appeared as counsel for the defendants, Tallman, Hubbard, Elmendorf, Jessup, Germaine and Merritt.

*Charles O'Connor* and *F. B. Cutting,* for the defendant Collyer.

*Edward Wells,* district attorney of Westchester county, and *Ralph Lockwood,* for sheriff of Westchester county. ·

*D. McMahon, Jr.,* opened the argument for the prisoners, and after alluding to the facts, stated that the gravamen of the charge as presented in the Westchester warrant, was as follows, viz:

First, The creation of an undue or an unsafe quantity of steam for the purpose of excelling the steam boat Armenia, in speed.

Second, For the purpose of keeping up that steam, making excessive fires, and in displaying the want of ordinary prudence in their management, and in continuing the same against the remonstrances of passengers, whereby the vessel caught fire, and said deaths ensued.

*Mr. McMahon* then argued and discussed the following points, viz:

I—The United States Court had exclusive jurisdiction of this offence of manslaughter committed by the same guilty and felonious act which the state courts complain of as murder. And the state authorities had no jurisdiction in the premises. Because

1. By the constitution, the judicial power of the United States government extended to all cases of admiralty and maritime jurisdiction. (*Constitution of U. S., art.* 3, *sec.* 2.)

2. Under the terms " admiralty and maritime," are comprehended waters which are navigable for the purpose of commerce. (12 *How., p.* 443.)

3. The term also includes legislation concerning offences committed inside of high water mark. (*United States* v. *Combs,* 12 *Peters, p.* 72.)

4. And where Congress has enacted an offence committed on tide waters and made it cognizable in the United States

The People *v.* The Sheriff of Westchester County.

Courts, they have exclusive jurisdiction of it. (*United States v. Bevans,* 3d *Wheat. p.* 333; *Martin* v. *Hunter,* 1 *Wheat.* 304.)

5. The United States have, by the act of 1838, regulated navigation on board of steam boats, and created an offence for causing the death of passengers by the acts of the captain and officers, and that act renders inoperative any state legislation on the same subject. (*Caldwell* v. *St. Louis Perpetual Ins. Co.,* 1 *La. Annual Reps. p.* 85; *Houston* v. *Moore,* 5 *Wheat* 149; *Gibbons* v. *Ogden,* 9 *Wheat. p.* 562.)

6. The act of Congress in such case is the supreme law of the land. (*State of Rhode Island* v. *State of Mass.,* 12 *Peters,* 647; *The Huntress, Daveiss,* 82; *Bark Chusan,* 2 *Story,* 453.)

II.—It can not be contended that running this boat on the shore makes the offence committed on it cognizable in the state courts because of its being committed on land—because,

1. The *corpus delicti,* viz., the gravaman of the charge as complained of in the Westchester warrant, was committed while navigating the boat on tide waters; and the consequence of that act, viz., the death of these persons, took place on tide waters, wherein they were drowned. (*U. S.* v. *Combs,* 12 *Peters' Reps. p.* 72, decides this question; *Plummer* v. *Webb,* 4 *Mason's Reps.* 383, 384; *Steele* v. *Thacher, Ware's Reps. p.* 91.)

III.—The death of John K. Symonds, by being burnt on the boat after it was run on the shore, can not be the support of the jurisdiction of this Westchester proceeding—because,

1. The death of John K. Symonds on the boat, and of the other passengers in tide waters, was the result of the same guilty and felonious act, which can not be separated so as to make different convictions for each death. For if the state authorities have jurisdiction of the offence of causing the death of John K. Symonds on the boat while on shore and thus considered in Westchester county, and if the United States have jurisdiction of the offence of causing the death of the other passengers who jumped in the water and were drowned — the act is the same and a conviction in either would be a bar to the other — because,

" No man can be put in jeopardy of life and limb twice for the same offence." (*N. Y. State Constitution, art.* 1, *sec.* 6; *Constitution of U. S., art.* 5 *of Amendments.*)

The word offence is synonymous with guilty and felonious act.

If either have a right to entertain it, then *quoad hoc* the jurisdiction must be considered as concurrent.

2. Then, if concurrent, inasmuch as the United States authorities have exercised it prior to the state authorities, this necessarily excludes the state jurisdiction. (*Smith* v. *McIver,* 9 *Wheat.* 532; *Ship Robert Fulton,* 1 *Paine's C. C. Reps.* 620; *Slyhoof* v. *Flitnatt,* 1 *Ashmead, p.* 171; *Capt. McKenzie's Case,* 1 *Legal Observer, pp.* 227 *and* 367; *Slocum* v. *Mayberry,* 2 *Wheat. p* 1; *Gelston* v. *Hoyt,* 3 *Whcat. p.* 246.)

IV.—If the state courts have a right to entertain jurisdiction of the offence, then we say that the facts developed in the warrant do not constitute the crime of murder — because,

1. The second subdivision of section 5 of 2 revised statutes, page 746 (3d ed.), does not include this case. For that clause has reference to acts of violence *imminently dangerous in themselves* committed by the guilty party for the purpose of effecting possibly homicide, and certainly personal injury to somebody out of a number of persons, thus: shooting a loaded gun into a crowd; throwing poisonous matter into a frequented well or spring, or into flour or provision exposed for sale, or the like. The act itself must be *imminently dangerous to somebody in general — must import violence and must evince a depraved mind.* The idea of murder implies action, and no degree of negligence or omission will amount to murder.

This subdivision is the statutory definition of what was formerly considered as coming within the law of murder where malice was inferred, but could not be proven expressly.

In this case at bar the only acts complained of are creation of *excessive fires and of excessive steam,* neither of which *ex vi termini* imports violence or injury. The legislature must have thought so, because they classed offences arising from deaths occasioned by bursting boilers or machinery because of

The People *v*. The Sheriff of Westchester County.

excessive steam, under the head of manslaughter in the third degree. (2 *Rev. Stat., p.* 751, *sec.* 16, 3*d ed.*)

If the reading contended for by the Westchester authorities is the law, then there was no necessity for the action of the legislature in creating this offence of manslaughter in the third degree; because there can be no reason why the legislature should make any between creation of undue quantity of steam and *excessive fires*. The bursting of boilers is not an unusual consequence upon too great a pressure of steam, and is a matter which would force itself upon the legislature for prevention, while the other is a novel case, and not therefore likely to be included in any statutory criminal definition. (*Barbour's Cr. L.* 67, 2*d ed* )

*Mr. Wells*, District Attorney of Westchester County, in reply, made the following points, viz:

I.—The facts charged in the warrant constitute the crime of murder under our statute. (2 *R. S.* 657, *sec.* 5, *subd.* 2.)

1. The conduct of the defendants as detailed in the warrant, though not intended to produce death, " was imminently dangerous to the passengers, and evinced a depraved mind, regardless of human life," within the meaning of that subdivision of the statute.

2. The lives of the deceased were lost by that conduct of the defendants. They persisted in doing an act manifestly dangerous to human life, regardless of the consequences and against the remonstrances of the passengers, and death resulted from the act. This was murder. (1 *Russell on Crimes*, 487.)

3. An express design to take life, or even to do bodily harm, is not necessary to constitute murder under this statute. Implied malice may still be sufficient in all cases where it would have constituted the killing murder before the revised statutes, except in the single case of an undesigned killing, while the slayer is committing a misdemeanor (*Revisor's notes*, 3 *R. S.* 809, 2*d ed.; People* v. *Rector*, 19 *Wend.* 592; *People* v *Enoch*, 13 *Wend.* 173, 174; *People* v. *Shorter*, 4 *Barb.* 470.)

4. The probable consequence of defendants' acts on board a

steam boat crowded with human beings, was the loss of lives. And the prisoners are presumed to intend the probable consequences of their own voluntary and willful acts. Those acts " indicated a heart regardless of social duty, and fatally bent on mischief," which is the criterion of murderous intent (*Foster's Crim. Law. p. 257.*)

II.—Even if it should be held that the case is not murder, then it is submitted, that the acts of the prisoners charged in the warrant, constitute manslaughter in the first degree (2 *R. S.* 661, *sec.* 6, *subd.* 8.)

1. Whatever amounts to a public wrong, is indictable as a misdemeanor, ex. gra., keeping a quantity of gunpowder in a place where there is apparent danger of mischief, is a nuisance, and is indictable as a misdemeanor, though no injury result. (*People v. Sands*, 1 *John.* 78.)

So riding, or going armed with unusual or dangerous weapons, to the terror of the people, is an offence at common law. (*State v. Huntley*, 3 *Iredell's Reps.*, 418; 1 *Russell on Crimes*, 46 *note.*)

The above and numerous other cases which might be put, illustrate the principle that whatever conduct is calculated to endanger public safety or to disturb public peace or quiet, is a misdemeanor.

2. The racing of steam boats with passengers on board, is a misdemeanor at common law, also by statute. (1 *R. S. 3d ed.* 863, *sec.* 24, *laws of* 1839.) The prisoners loaded their boat with passengers, they induced them to go on board and commit their lives to the care of those having charge of the boat, under pledge of safe transportation, and then raised an undue and unsafe quantity of steam, and in so doing, made excessive fires, and did not use ordinary prudence in the management thereof, for the purpose of racing with a rival boat. Passengers became alarmed and remonstrated against it. The relators paid no attention to the remonstrances, but obstinately persevered in their conduct till the boat, overheated by an excess of badly managed steam and fire, was consumed, and nearly one hund-

The People *v.* The Sheriff of Westchester County.

red lives were thereby lost. The facts are no doubt a misdemeanor.

III.—If the defendants are guilty of neither of the foregoing offences, it may be a question whether the case does not fall under the head of manslaughter in the third degree. (2 *R. S. p.* 661, *sec.* 13, *3d ed.*)

1. The voluntary killing of a human being by the act, procurement or culpable negligence of another, while such other is engaged in the commission of a trespass or *other injury to private rights*, or property, or engaged in an attempt to commit such injury, shall be deemed manslaughter in the 3d degree.

2. The conduct of the prisoners in persisting in the acts charged in the warrant after remonstrances from the passengers, was clearly an injury to their private rights. It was actionable—it was not *damnum absque injuria.*

IV.—The provisions of 2 *R. S.* 751, *sec.* 19 (*3d ed.*), defining manslaughter in the fourth degree, are not limited to cases where the death is the immediate result of the criminal act; but that section applies to all cases where the death can be clearly traced to the criminal negligence, &c., as its cause, for it is the certainty, and not the nearness of connection between the cause and effect, that fixes responsibility.

V.—If the judge shall be satisfied that any criminal offence is sufficiently charged in the warrant, he should remand the prisoners to the sheriff to be by him conveyed before the officer who issued the warrant, to be dealt with according to law.

1. The existence and validity of the warrant are the only facts traversable on the return of the habeas corpus. (*People* v. *McLeod*, 1 *Hill*, 404; *People* v. *Cassels*, 5 *Hill*, 167, 168; *Bennac* v. *People*, 4 *Barb.* 31; 2 *R. S.* 663, *sec.* 54, *3d ed.*, *sec.* 39, *original.*)

2. The power to bail on this writ is confined to the case of a commitment, and does not extend to the case of a party *arrested* under valid process. In such a case the writ must wait until the powers of the magistrate who issued the warrant are spent. This writ does not arrest regular proceedings. (2 *R S.* 664, *sec.* 58, 59, *3d ed. and p.* 794, *sec.* 11.)

VI.—The United States Courts have no jurisdiction of the offence charged in the warrant.

I.—This case is not cognizable under the grant of power to regulate commerce, for the Henry Clay was engaged in a navigation within the jurisdiction of the State of New York. (*U. S. Constitution, art.* 1 *sec.* 8; *Gibbons* v. *Ogden,* 9 *Wheat.,* 194.)

II. Nor under the power to define and punish felonies on the high seas.

(a.) The place where the offence was committed was not on the high seas. (1 *Kent,* 367 *and note a.*)

(b.) The power to *define ex vi termini,* merely authorizes congress to fix and limit the definition of offences which were already felonious, and does not authorize the creation of any new felony such as is designated in the act of congress of 1838, chapter 191, section 12. (*United States* v. *Smith,* 5 *Wheat.* 158.)

III. The act of 1838, chapter 191, section 12, does not apply to this case.

(a.) It was passed in execution of the power of congress to regulate commerce, and therefore does not govern steam boats navigating exclusively within the limits of any one state. (*Fitch* v. *Livingston,* 4 *Sandford S. C. Reps.* p. 507.)

(b.) There is ample scope for the operation of that act by confining it to commerce with foreign nations and among the several states.

IV. The place where the offence was committed is within the body of a county and in the limits of a state, and that state courts have jurisdiction of all crimes there committed. (*U. S.* v. *Beavins,* 3. *Wheat.* 387; *U. S.* v. *Grush,* 5 *Mason C. C. Reps.* 290; 2 *Story on Constitution, sec.* 1673.)

(a.) The United States' courts will not exercise admiralty jurisdiction in criminal cases without a particular legislative provision in the case. (1 *Kent's Coms.* 363; *U. S.* v. *Coolidge,* 1 *Wheat.* 415.)

(b.) The Crimes' Act of 1790, chapter 9, section 8, and the act of 1825, chapter 73, section 26, reserve the state jurisdiction.

V. Should it be held that the jurisdiction of the national and of the state courts over this offence is concurrent, still the United States' courts have not by any action taken by them obtained an exclusive jurisdiction over the case of the prisoners.

I. This case is not before the United States court. It has as yet, no power over the prisoners, and will get none until an indictment is found. It will then, and not until then, have power to adjudge the cause. (19 *Johns.* 39.)

2. The recognizance given by the prisoners is only an obligation that they will put themselves into the power of the district court and submit to its judicial action. Till they shall actually appear in that court, the court will obtain no jurisdiction over their persons; and this is necessary to make that jurisdiction exclusive of the action of the state courts. (*Acts of Congress of* 1842, *chap.* 188, *sec.* 1; *Stat. at Large, vol.* 5, *p.* 517.)

VI. The proper way for the prisoners to raise the objection to the state jurisdiction, is by demurrer or by plea to the jurisdiction when an indictment shall have been found against them.

*Ralph Lockwood,* on same side, in addition to the points raised by his associate, urged the following distinction, viz:

That the charge as presented in the Westchester warrant was clearly one of murder. That conceding the crime to have been committed within the jurisdiction of the admiralty, yet as the specific offence was one of murder committed on the waters within the jurisdiction of a state (*infra corpus comitatus*) and as congress had not yet legislated upon any criminal act amounting to murder, therefore, under the authority of *U. S.* v. *Bevans,* (*in* 3d *Wheaton's Reps. p.* 336,) the case at bar was clearly without the jurisdiction of the United State courts, and the state courts had therefore, until congress so legislated, exclusive jurisdiction of the offence.

The counsel then discussed at some length the further position that the charge in the Westchester warrant was something more than what was intended to be comprehended within the United States' complaint.

The counsel illustrated this by referring to the various meanings of the term misconduct, used in the twelfth section of act of congress of 1838. He further insisted that the court had no right now to determine whether these parties could be convicted of murder; that was for the jury. It was only necessary to inquire whether the offence was presented as one of murder; if so, the United States' courts had no jurisdiction. He also commented on 5th Howard, 433, and 9th Howard, 568, and maintained that the guilty and felonious act might give rise to two offences and consequently two punishments.      •

*Charles O'Conner*, in reply, discussed the following points:

*First Point.*—The attempt to bring this case within the operation of the second subdivision of the section defining murder, is not warranted by law or reason. (2 *R. S.* 657, § 5, subd. 2.)

1. The offence defined in that subdivision can not be committed " *if bodily harm is not intended.*" (*Revisers' Notes*, 3. *R. S.*, 809, 2d ed.; *Add. R.* 283; 4 *Bl. Com.* 192.)

2. It is not pretended in the district attorney's complaint as recited in the warrant, that such harm was intended, nor has there ever been an imputation to that effect.

3. The whole section aimed at repudiating the doctrine of *constructive murder* except in a single case not relevant to the present inquiry, i. e., where the person causing the death was at the time engaged in the commission of a felony. (2 *R. S.* 657, § 5, subd. 3.)

*Second Point.*—The matters charged in the complaint as recited in the warrant, do not constitute the offence of manslaughter in any of its grades.

I.—In order to constitute the crime of manslaughter in the first degree, it would be necessary to show that the acts or omissions imputed to the relators, and which are alleged to have occasioned death, occurred while they were engaged in the perpetration of some crime or misdemeaner. (2 *R. S.* 661, § 6.)

1. Although the generation of such an amount of steam " *as to burst or break*" the boiler or apparatus, is under certain circumstances a misdemeanor, (2 *R. S.* 780, § 27, 3d ed.) where this consequence does not ensue, no offence is committed.

2. There is no pretence that any such consequence ensued, or that there would have been any offence against law in anything which was done or omitted, if no death or personal injury had occurred.

II. None of the acts or omissions imputed to the prisoners bear the least resemblance to the circumstances which constitute manslaughter in the second or third degrees, (2 *R. S.* 661, §§ 11, 12, 13, 14, 15, 16, 17,) unless such resemblance can be found in § 16.

III. The essence of the offence created by § 16 is the creation of " *such an undue quantity of steam as to burst or break the boiler or other apparatus.*"

1. Nothing of this kind is charged

2. Nothing of this kind could have been charged. There is no pretence for it.

IV. The comprehensive provisions of § 19, defining manslaughter in the fourth degree, do not embrace the case alleged against the relators.

1. It applies only to acts or omissions which directly assail life, and by their own immediate effects produce its extinction

(a.) The circulation by inadvertence of a false alarm which should cause a person to cast himself into the sea and thereby cause his own death is an illustration of this point. Hundreds of analogous illustrations might be supposed. *Causa proxima non remota spectatur.* (1 *East. Pl. Cr.* 265; *Col. Ins. Co. v. Lawrence,* 10 *Peters,* 508; *Peters v. Warren Insurance Co.* 14 *ib.* 109.)

(b.) The defendants are not charged with having set fire to the boat. It is said that they did not keep with due care the fire lit for a lawful purpose. It is alleged as a consequential result, that the boat took fire. If this was so, and as alleged, one death ensued from that cause only, it could not be alleged that the defendants " killed" that person.

*Third Point.*—No crime or misdemeanor defined in any statute of this state or known to the common law, is shown to have been committed by the defendants.

*Fourth Point.*—If any offence shall be deemed to be **duly**

charged in the complaint, the judge having cognizance under this writ should admit the defendants to bail. (2 *R. S.* 569, § 68.)

*Fifth Point.*—The courts of the United States have exclusive cognizance of the offence imputed to the defendants.

I. The judicial power of the United States extends " to all cases of admiralty and maritime jurisdiction." (*Const. U. S art.* 3, § 1; 3 *Story Com. on Con.* § 1745.)

II. Admiralty and maritime jurisdiction extends to all crimes and offences committed as well upon arms of the sea and tide waters within the limits of a particular state as upon the high seas. (*United States* v. *Bevan,* 3 *Wheat.* 336; *Whart. Criminal Laws,* 85 )

III. This grant of power to the government of the United States is not in its own nature exclusive of, but on the contrary is concurrent with the like power of legislation for the suppression of crime by the states. But wherever congress in cases of concurrent power acts upon and assumes to regulate the subject, such exercise of the power renders it thenceforth practically exclusive. It prevents future legislation over the subject of the states, and supersedes all existing state legislation in relation to it. (*Jack* v. *Martin,* 12 *Wend.* 311, 317; *In re Kirk,* 4 *Leg. Ob. Briggs'* case, 16 *Peters.*)

IV. By the act of July, 1838, statutes at large of U. S., vol. 5, p. 306, congress has regulated this whole subject. And as a necessary consequence the relators can only be proceeded against under that act and in the courts of the United States.

V. The objection to the action of the state courts is not technical nor evasive. The relators are actually under prosecution in the courts of the United States, and held to answer therein. It is contrary to natural justice and to the fundamental principles of the criminal law, as well as to an express provision of our own state constitution, that two distinct punishments should be inflicted for the same offence. (2 *R. S. of* 1801, *p.* 14, *as to boundaries of Yonkers.*)

The court held the matter over until the 6th day of September, 1852, when the following decision was rendered:

The People *v.* The Sheriff of Westchester County.

EDMONDS, J.—It appears on the return of the habeas corpus, that the prisoners were held in custody on a warrant issued by one of our state magistrates, charging them with the crime of murder, in causing the death of certain persons named, and that they have already been arrested on process issued out of the United States, for the same act, on a charge of manslaughter.

There are two important questions presented in this matter, one, whether the offence charged in the warrant is murder under our statute, and the other, whether, if it is, the offence is not under the law of congress cognizable by the federal courts to the exclusion of the state courts.

There is another question which it may be necessary to examine, and that is, whether the offence, if not murder, s not manslaughter under the state statute.

The question of jurisdiction is the most material one, for if the state courts have not, under the circumstances, cognizance of the offence charged, the defendants are entitled to an absolute discharge from their arrest; whereas, otherwise, the question may be merely whether they shall be let to bail or not.

I begin by saying that I can not recognize the distinction taken by one of the counsel, that because congress has not made the offence which its statute aimed at, murder, but only manslaughter, therefore the state tribunals are at liberty to take cognizance of the matter if the state laws elevate the crime to that grade. That would be making the punishment, and not the offence, the standard of jurisdiction, and would permit the state authorities, by increasing the penalty, to obtain jurisdiction over offences clearly cognizable only by the federal courts.

It is the nature and quality of the act, and not the extent of the penalty or punishment, which is to be the measure of the jurisdiction. And in this fact, I must look into the warrant to see what that is.

That sets forth that the steamer Henry Clay was engaged in carrying passengers on the Hudson; that on one of her trips, with certain passengers on board, she caught fire and was

consumed, whereby the persons named in the warrant were killed.

After this preliminary statement of facts, the warrant charges that the prisoners, who then had charge of the boat, " for the purpose of excelling in speed" another boat, " or for the purpose of increasing the speed" of their steamer, " did create or allow to be created an undue or an unsafe quantity of steam, and in so doing did make or cause or allow to be made excessive fires,.and did not use ordinary prudence in the management of said fires," but, remonstrated with, " for a long while, continued the same," in consequence whereof the boat took fire, all the deaths ensued, and it concludes that the deceased were murdered by the prisoners by an act which was " eminently dangerous to others, and evinced a depraved mind, regardless of human life, " though without any premeditated design to effect the death of any particular individual."

The proceedings of the United States authorities charge that the defendants " by their misconduct, negligence or inattention to their duties on board the said steam boat did cause the death" of some of the same persons.

The proceedings in the United States courts are under the law of congress, which enacts that every captain, engineer, pilot or other person employed on board any steam boat, &c., by whose misconduct, negligence or inattention to his or their respective duties, the life or lives of any person or persons on board the said vessel may be destroyed, shall be deemed guilty of manslaughter. (5 *United States Statutes at Large*, 306, *sec.* 12.)

The proceedings in the state courts are under the state statute, which enacts that the killing of a human being without the authority of law, when perpetrated by an act imminently dangerous to others, evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder.

And the question before me is, whether they are liable to be proceeded against in the state courts, or whether those courts are not ousted of their jurisdiction by that of the federal courts.

The fact that the federal courts have already instituted proceedings, and thus assumed jurisdiction, is not material on this inquiry; for it is the termination and not the commencement of proceedings in one court which may be pleaded in another. It is the judgment, and not the proceedings preliminary thereto, which is a bar to a second judgment.

It is no unusual thing for proceedings to be instituted for the same cause of action in two different courts having concurrent jurisdiction, nor is it unusual, where the United States and the State courts have concurrent jurisdiction, for them to allow a judgment rendered in one to be a bar to the recovery of a judgment in the other. ( 1 *Kent's Com.* 399.)

It is therefore unnecessary for me to dwell upon the consideration which was pressed on the argument, that the prisoner may be in danger of being twice convicted for the same offence, for the time to raise the objection has not yet arrived, and when it shall arrive, the several courts will be able to afford the adequate relief against what would be so flagrant a wrong.

The jurisdiction of the federal authorities over the subject is claimed to rest on that clause of the constitution which gives congress the power " to regulate commerce among the several states," (*art.* 1, *sec.* 8,) and that which gives to the United States courts judicial power over " all cases of admiralty and maritime jurisdiction." (*Art.* 3, *sec.* 2 )

It is well settled that until congress does exercise its power over a subject properly within its jurisdiction, the previously existing authority of the state to act upon the same subject is unaffected. It is only necessary to refer in illustration to the question of state insolvent laws, determined in Sturgiss or Crowningshield, 4 Wheat. 122.

But whether in all cases when congress does take cognizance of a subject, it is to the exclusion of all state authority on it, is another question, and not perhaps quite so well settled.

The rule is very well stated by the Supreme Court of this state, in the case of *The United States* v. *Lathrop,* ( 17 *John. R.* 9.) There it is said: " The jurisdiction of the state courts is in no instance excluded where they had a pre-existing juris-

diction, except in those cases of a national character, such as admiralty and maritime matters, and suits against ambassadors and other public ministers, consuls, &c., but the jurisdiction of the state courts is excluded in cases of crimes and offences cognizable under the authority of the United States, and in suits for penalties and forfeitures incurred under the laws of the United States."

But this rule leaves the question open in this case, whether the offence with which these prisoners are charged is not a matter of " admiralty and maritime jurisdiction," and whether it is not cognizable under the authority of the United States," and therefore excluded from the cognizance of the State courts?

It is not easy, from the reports, to ascertain where the dividing line is. In some cases it is very faint, and not easily definable, as in cases of collision on tide waters and maritime contracts. (*See Waring* v. *Clarke,* 5 *How. U. S. R.* 441.)

In other cases it is more marked, as in the case of the reclamation of fugitive slaves, where it is held that the exercise of the power by the nation is exclusive of all interference by the state. (*Prigg's Case,* 16 *Peters,* 539.)

And in others, it is in a measure apparently obliterated, as in case of imposition of taxes, and the government of the militia, where both authorities have jurisdiction under certain circumstances. (*Houston* v. *Moore,* 5 *Wheat.* 1.)

In *The United States* v. *Bevans,* (3 *Wheat.* 336,) it was held that the United States courts had not jurisdiction of the crime of murder, committed on board a national vessel in the harbor of Boston, because it was committed within the jurisdiction of a state, and the law of congress gave the United States courts cognizance only of " offences committed on the high seas or in any river, haven, basin or bay out' of the jurisdiction of any particular state." It was also held that the cession of admiralty and maritime jurisdiction to the federal courts did not give them cognizance of the offence, because that could not be construed into a cession of the waters on which those cases arise, and the power of exclusive legislation (which is juris-

The People *v.* The Sheriff of Westchester County.

diction) is united with cession of territory, and the general jurisdiction over the place adheres to the territory as a portion of the state sovereignty not given away.

In one aspect that case is like that now under my consideration, and decides, at all events, that the mere grant of admiralty and maritime jurisdiction does not exclude state authority. But there was another point in that case, and that was, that congress had not legislated as to the offence when committed within state territory. Since then congress has supplied the defect, and legislated for such a case. But still it is unsettled whether, since congress has done so, the state is excluded from all authority, and that is the precise question before me; and it is a grave one when we consider the language of the court, "That exclusive legislation (which is jurisdiction) is united with cession of territory."

There has been no cession of territory at the place where the offence charged in the case was committed; and when we consider that the argument urged by the prisoners here, if allowed to prevail, will necessarily deprive the state of all power of legislation on the subject of steam boats in our navigable waters, the point becomes too serious to be lightly or summarily disposed of.

On the other hand, it was held in *Houston* v. *Moore,* supra, that in every case in which the state tribunals should not be expressly excluded by the acts of the national legislature, they would of course take cognizance of the causes to which these acts might give birth, and that the grant of jurisdiction generally was not of itself sufficient to rest an exclusive jurisdiction. Chancellor Kent ( 1 *Com.* 400) sums up his examination of the question in these words: " The conclusion, then, is, that in judicial matters the concurrent jurisdiction of the state tribunals depends altogether upon the pleasure of congress, and may be revoked and extinguished whenever they think proper, in every case in which the subject matter can constitutionally be made cognizable in the federal courts, and that without an express provision to the contrary, the state courts will retain a

concurrent jurisdiction, in all cases where they had jurisdiction originally over the subject matter."

Our court for the Correction of Errors in *Delafield* v. *State of Illinois*, (2 *Hill*, 164,) took the same view of the question. *Bronson*, J., in delivering the opinion of the court, says: "There is, I think, no instance in the whole history of the law, where the mere grant of jurisdiction to a particular court, without any words of exclusion, has been held to oust any other court of the powers which it before possessed." In stating his views he alludes to criminal cases, and denies that a person, who within our territory commits a crime which is cognizable in the United States courts, is thereby exempt from being prosecuted in the state courts, and he remarks, " probably no one is prepared to carry the doctrine of exclusive jurisdiction so far."

From this examination, it is by no means certain that the state authorities have not jurisdiction although the federal authorities have claimed and exercised it.

There is still another view of the case, in which it may be that the state tribunals may have jurisdiction in cases like this. Something more is necessary to convict, under the state jurisdiction, than under that of the federal authorities. In the latter, any misconduct, negligence or inattention, which results in a sacrifice of life, may be enough for conviction, but under the former more must necessarily be proved, namely, some act that evinces a depraved mind, regardless of human life — some act imminently dangerous, not one which may or may not harm, but one that must almost necessarily do so. And it may be well that that is an offence in respect to which congress has not legislated, so that in any view, the state authority may be untrammeled. I am not so clear that it may not be so, as to leave no doubt on my mind. From the views I have thus stated, it will be perceived that I am by no means clear that the state courts have not jurisdiction. If I was satisfied of that, the prisoners would be entitled to their discharge. But as, to say the least, it is a matter of doubt, it is my duty to hold them until the question can be determined in the proper

The People *v.* The Sheriff of Westchester County.

form. This result renders it necessary for me to examine the other question raised — whether any crime against our laws is charged in the warrant, and if so, what one, so as to determine in what manner the prisoners shall be tried. That involves the question whether an unlawful killing by an act imminently dangerous and evincing a depraved mind, regardless of human life, of itself constitutes the crime of murder under our statute, and whether it is not also necessary to prove an intention to hurt some one. The revisors, in their notes to this statute, say it was not intended there should be any departure from the then existing law, except as to implied malice, and for this particular enactment they refer to Hale's Pleas of the Crown. There it is stated that the intent to do bodily harm is necessary, in such a case, to constitute murder, and that writer in illustration, instances the case of a man who, knowing that people are passing along the street, throws a stone or shoots an arrow over the house or wall with the intent to do hurt to people, and some one is thereby slain — this is murder; and if it were without such intent, it is manslaughter. I am not at liberty to depart from the rule as thus stated, and it must govern me in the construction of our statute, until the court shall put a different interpretation upon it. And this view of the statute is confirmed by the fact, that the revisors recommended a provision that would have made an unlawful killing murder, when perpetrated from a premeditated design to do some great bodily injury, although without a premeditated design to effect death; but the legislature refused to enact it — thus implying, to my view, that a design to do great bodily harm, or an intention to kill, must attend an act imminently dangerous, &c., to make the crime murder. I at one time thought that there could be no conviction for murder under this clause of our statute, unless there was an intention to take the life of some one, though it was not necessary to prove an intent to take the life of any particular individual. Therefore it was that in the case of *Austin* (7 *N. Y. Legal Observer*, 117), I remarked, whether the act was murder or manslaughter under our statutes depended entirely upon the existence of an intention to kill either some

particular person or generally some one of a number of persons, against whom, in a mass, the fatal act is perpetrated. There is only one homicide known to our law which becomes murder in the absence of an intention to effect death, and that is when the act is perpetrated by one then engaged in committing a felony. I am not yet satisfied that in this I was wrong, though it is not necessary to decide that point here. It is enough for this occasion that I deem there should be evidence at least of an intention to do some bodily harm; and that must be so or our statute must be held to punish a homicide perpetrated without any intention to do wrong, more severely than one perpetrated by one actually engaged in the commission of a crime or misdemeanor not amounting to a felony. Under our statute the latter is manslaughter only, and it can not be that it means to treat the other as murder. Now, in this case there is no allegation of an intention to do bodily harm, but, on the contrary, the facts alleged negative that idea; and thus, as one essential element to constitute the crime of murder is wanting, the prisoners ought not to be held on that charge. They ought not, however, to be fully discharged, but may properly be held for manslaughter, and, I am inclined to think, in the first degree. That is defined in our statute to be " the killing of a human being, without a design to effect death, by the act, procurement, or culpable negligence of any other, while such other is engaged in the perpetration of any crime or misdemeanor not amounting to felony." (2 *R. S.* 661, *sec.* 6.) And it is also enacted that, if the person having charge of a steam boat navigating our waters, or the person having charge of the boiler, for the purpose of excelling any other boat in speed, or for the purpose of increasing the speed of such boat, create or allow to be created an undue or unsafe quantity of steam, they shall be guilty of a misdemeanor. (*Laws of* 1839, *ch.* 175, 63.) Here it is alleged in the warrant, in the very language of the statute, that the killing occurred while the prisoners were engaged in performing those very acts. So that, although the warrant calls the offence murder, that which it details is, in fact, not murder, but man-

The People *v.* The Sheriff of Westchester County.

slaughter. Whether it is manslaughter in the first or some other degree, depends upon some question of interpretation, which I do not feel myself now called upon to consider. It is enough for this case, that I am satisfied that the prisoners are not, under the statute, properly chargeable with the crime of murder, which is not bailable, but with an offence for which they may be let to bail. The conclusion, then, at which I have arrived is, that the absence of jurisdiction in the state courts is not so clear as to warrant the total discharge of the prisoners; that they can not, however, be held on the charge of murder, but may be held on the charge of manslaughter; and that, as that offence is bailable, they may be admitted to bail